IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES R. FITCH, | ) | CASE NO. 4:11CV1365 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff James R. Fitch ("Plaintiff" or "Fitch") seeks judicial review of the final decision

of Defendant Commissioner of Social Security ("Commissioner") denying his application for

social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and

Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

Fitch filed his applications for disability insurance benefits and supplemental security

income on May 27, 2008.  Tr.142-146. In the May 27, 2008, applications, Fitch alleged a

disability onset date of January 2, 2001.  Tr. 142, 145.  He alleged disability based on depression

and learning problems.  Tr. 77, 80.  After denials by the state agency (Tr. 73-82, 86-98), Fitch

requested a hearing (Tr. 99-100), and an administrative hearing was held before Administrative

Law Judge  ("ALJ") Richard D. Brady on May 7, 2010.  Tr. 34-58.

In his May 17, 2010, decision, (Tr.12-33) the ALJ determined that Fitch had not been

under a disability from December 12, 2003, through May 17, 2010, the date of the ALJ's

decision.[1]  Tr. 15, 29.  Fitch  requested review of the ALJ's decision by the Appeals Council. Tr. 10-11 .  On May 20, 2011, notwithstanding Fitch's submission of additional evidence submitted in connection with his request for review, the Appeals Council denied Fitch's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.  Personal and Vocational Evidence

Fitch was born on December 3, 1967, and was 42 at the time of the hearing.  Tr. 39.  He completed school through ninth grade, and although he tried, he was unable to obtain a GED.  Tr. 39.  Fitch was married once for approximately three and a half months.  Tr. 49-50.  He has no children.  Tr. 301.  He was single at the time of the hearing and residing with his parents.  Tr. 39-40, 50.  Fitch last worked in 2007.  Tr. 41, 46, 49.  His past employment included work as a press operator, stocker, temporary worker and construction laborer.  Tr. 54, 170.

### B.  Medical Evidence

#### 1.    Treating physician – Columbiana County Counseling Center

The record includes treatment notes from Columbiana County Counseling Center dating back to 2002.  Tr. 300.  In 2002, Evelyn Abraham, Ph.D. saw Fitch and treatment notes from that visit reflect that Fitch reported that he was turned down for social security; he believed that the counseling records were influential in that decision and he wanted to explain his depression for Columbiana County Counseling Center's records.  Tr. 300.  Records from July 13, 2005, show

---

[1] Plaintiff previously filed a disability application in 2002 alleging disability beginning on September 16, 2000.  Tr. 15, 59-72.  That application was denied in a December 11, 2003, decision.  Tr. 15, 59-72.  The ALJ found that the Plaintiff had not alleged or shown a basis to reopen that application.  Tr. 15.  Further, the ALJ applied *Drummond v. Comm'r of Soc. Sec*, 126 F.3d 837 (6th Cir. 1997) and Acquiescence Ruling 98-4(6), 1998 SSR LEXIS 5 (June 1, 1998), and dismissed the request for hearing under the doctrine of *res judicata* for the period of January 2, 2001, the alleged onset date through December 11, 2003, the date of the prior hearing.  Tr. 15.  The Plaintiff does not challenge the ALJ's application of *res judicata* to this period.

that Fitch had discontinued medication back in January 2005; was refusing employment, not leaving his home, feeling depressed; and had reported suicidal ideation to his mother.  Tr. 290, 293.  He was diagnosed with depressive disorder, not otherwise specified, and personality disorder, not otherwise specified, and assessed a GAF score of 55.[2]  Tr. 290, 297.  On October 28, 2007, Fitch was at the emergency room requesting a refill of his medication.  Tr. 270.  He reported that he had run out of his medication that he was supposed to take for depression and, since not having taken some of his medication, he was "more agitated and generally short tempered."  Tr. 270.  He was given medication and advised to follow up with his treating psychiatrist within the next 3-4 days.  Tr. 271.

The next documented treatment records for Fitch's mental impairment begin in 2008 with psychiatrist Dr. Madhubala Kothari, M.D.  Tr. 346-358.  On May 15, 2008, Fitch "seemed to be doing fine in terms of mood, affect and behavior" with "no new symptoms or complaints."  Tr. 346.  On May 29, 2008, Fitch was "doing well" with "no new symptoms or complaints."  Tr. 347.  On July 17, 2008, Fitch's medications were switched to "the choice of his [Fitch's] medication" because Fitch did not believe he was benefitting from certain medications that he was taking.  Tr. 348.  Following a hospitalization in August 2008 at St. Elizabeth's hospital after he became depressed and out of control and had not been taking his medication, Dr. Kothari's August 28, 2008, treatment notes indicate that the combination of medications that Fitch was then on seemed to be working well.  Tr. 247, 308, 349.  Again, on September 25, 2008, Fitch "seemed to be doing fine in terms of mood, affect and behavior" with "no new symptoms or complaints."  Tr. 350.

---

[2] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

In 2009 and 2010 Dr. Kothari along with case manager Belinda Niswonger continued to treat or provide services to Fitch.  Tr. 402-447.  In January, February, March, April, August, October, November and December of 2009, Dr. Kothari noted that Fitch seemed to be doing well.  Tr. 438-440, 442, 444-447.  He was not seen by Dr. Kothari in May or June of 2009.[3]  In July 2009, Fitch had missed his medication for a couple of days because he had not shown up for an appointment and Dr. Kothari encouraged Fitch to remain compliant with his medication.  Tr. 443.  In September 2009, Dr. Kothari complimented Fitch for attending his appointment on time and emphasized to Fitch the importance of follow up care.  Tr. 441.  In February 2010, Dr. Kothari again noted that Fitch "seemed to be doing fine in terms of mood, affect and behavior." Tr. 437.

Fitch generally saw his case manager each month during 2009 and 2010.  Tr. 403-436. Most of the visits occurred at Fitch's home.  Tr. 403-436.  The case manager's records reflect that one of Fitch's goals was to get social security and live independently from his parents.  Tr. 403.  He talked about what he was going to do with the back money he received from social security, i.e., move out of his parents' home, buy a car, buy things rather than receive items from the donation center.[4]  Tr. 419.

In April 2009, he reported going to a local bar and, while there, he inquired about a job as a bouncer but the bar was not hiring.  Tr. 427.  In June 2009, Fitch reported he had stopped going to the bar but was getting out of the house – he had walked from his house to the high school and walked the track there; he also had walked to the community pool.  Tr. 425.  In July 2009, Fitch had taken some of his mother's sleeping pills.  Tr. 421.  He reported to his case worker that he

---

[3] Following the April 2009 visit, it was recommended that Fitch follow up in the next two to three months.  Tr. 444.

[4] On August 5, 2009, his case worker suggested that Fitch focus  not on what he does not have but on his future, i.e., where he would like to live and what he was going to purchase with social security money when awarded.  Four months later, on December 3, 2009, Fitch's case worker suggested that Fitch should not make his future dependent upon hearing from social security.  Tr. 409.

had missed his appointment with Dr. Kothari and did not get his prescriptions refilled.  Tr. 421.

In September 2009, Fitch's case worker suggested he become active in a singles group at the

church or volunteer at the library so that he could fill his day with some activities.  Tr. 417.

Fitch indicated that he would have to come up with activities that did not involve driving because

he was uncomfortable driving his father's car.  Tr. 417.   In October 2009, it was suggested that

Fitch consider volunteering, walking, attending functions at the counseling center and meeting

with a therapist.  Tr. 415.   Fitch indicated that he was a "home body" and did not want to

volunteer or attend functions at the Center; yet, he had previously reported going to bars.  Tr.

415, 427.  Further he said he had attempted to talk with a therapist but that the therapist did not

help him.  Tr. 415.  Also, in October 2009, his case worker encouraged him to get out into the

community even if only to shop with his parents, take a walk on a different route or go to the

library.  Tr. 413.  Fitch indicated he would just rather not be around people.  Tr. 413.   Towards

the end of 2009 and beginning of 2010, Fitch indicated that he was enjoying chatting on line with

women.  Tr. 407, 409, 413.  In February 2010, Fitch declined his case worker's suggestion that

he consider a peer mentor program through a counseling center.  Tr. 405.  In March 2010, Fitch

described to his case worker the fun time he had with his brother and sister-in-law bowling.  Tr.

403.  His case worker suggested that Fitch tell his brother what a good time he had and suggest

they get together once each month.  Tr. 403.  Fitch indicated that he did not want to pressure his

brother because he had no money and his brother had to pay for the bowling.  Tr. 403.  Also,

during that visit in March 2010, in response to his case worker suggesting that he consider

working out outside, Fitch indicated that he felt safer working out at home rather than walking

on the road.  Tr. 403.

On March 30, 2010, Dr. Kothari completed a "Functional Assessment of Mental Disorders" ("Functional Assessment") that assessed Fitch's degree of impairment in the following areas: social interaction; sustained concentration and persistence; and adaptation.[5]  Tr. 449-451.  In the area of social interaction, Dr. Kothari found no severe impairments, three moderate impairments and one slight impairment.  Tr. 449.  In the area of sustained concentration and persistence, Dr. Kothari found one severe impairment, one moderate impairment and three slight impairments. Tr. 450.  In the area of adaptation, Dr. Kothari found two severe impairments, two moderate impairments and two slight impairments.  Tr. 450-451.  The specific areas in which Dr. Kothari found severe impairments were: (1) ability to maintain attention and concentration; (2) ability to behave predictably, reliably and in an emotionally stable manner; and (3) ability to tolerate high stress work on a sustained basis.  Tr. 450-451.  In the Functional Assessment, in handwritten notes, it states: "Jim has had twelve jobs in which he has not been sustained in employment.  Jim has panic attacks, becomes paranoid of others, fights depression symptoms.  Cycles with periods of mania." Tr. 451.  Further, it states that "[i]t is unlikely that Jim will be able to sustain employment due to ongoing symptoms associated with his mental diagnosis of bipolar disorder and personality disorder."  Tr. 451.

    2.    **Consultative physician – Dr. Donald Degli, M.A.**

Dr. Donald Degli, M.A., an examining psychologist, evaluated Fitch on August 25, 2008. Tr. 301-305.  At the time of the examination, Fitch had been released from St. Elizabeth's

---

[5] The rating choices in each of the areas were no impairment, slight impairment, moderate impairment or severe impairment.  Tr. 449-451.

psychiatric unit a few days prior.[6]  Tr. 301.  Dr. Degli described Fitch as cooperative but "keyed up" (overly talkative, overly animated, digressing at times in a tangential manner).  Tr. 301. Fitch reported having a girlfriend on a chat line.  Tr. 302.  Dr. Degli indicated that Fitch "appears to live a rather isolated existence, socially inept, 'a loner all my [his] life.'"  Tr. 302.

The Wechsler Adult Intelligence Scale – Third Edition was administered with the following results: Full Scale IQ of 75; Verbal IQ of 73; and Performance IQ of 80.  Tr. 303.  Dr. Degli opined that these scores were indicative of borderline intellectual functioning.  Tr. 303.

Dr. Degli indicated that his personality and emotional assessment revealed an individual with depression and mixed personality disorder.  Tr. 303.  Dr. Degli assessed a GAF score of 60.[7]  Tr. 303.

Dr. Degli opined that: (1) Fitch's ability to interact with peers, supervisors, or the adult public in a competitive work place is moderately impaired and therefore would require working in an isolated work setting; (2) Fitch's ability to follow directions or do routine tasks for meaningful periods in a competitive work environment is mildly impaired due to his borderline intellectual functioning; (3) Fitch's ability to maintain attention, concentration, persistence and pace in a competitive work setting is mildly impaired due to his intellectual deficiency; and (4) Fitch's ability to withstand the stresses and pressures of a competitive workplace is moderately impaired due to his intellectual deficiency, depression and personality inadequacies.  Tr. 304. Dr. Degli further indicated that psychologically Fitch is moderately impaired in his ability to meet the demands of competitive adult employment.  Tr. 304.

---

[6] The hospitalization was due to depression, auditory hallucinations and suicidal ideation; he was not taking his medication.  Tr. 247, 308.  He was discharged within two days with medications and instructions to follow up with his psychiatrist.  Tr. 247.

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR at 34.

### 3.      State agency reviewing physician – Kristen Haskins, Psy.D.

On October 8, 2008, Kristen Haskins, Psy. D. completed a Mental RFC and a Psychiatric

Review Technique.[8]  Tr. 306-323.  Dr. Haskins gave great weight to the opinions of Dr. Degli.

Tr. 309.  Dr. Haskins considered Fitch's subjective statements regarding his alleged symptoms

but it was her opinion that the intensity of the symptoms and the impact on functioning as

described by Fitch were not consistent with the totality of the evidence.  Tr. 309.  She pointed to

the fact that although Fitch reported he could not handle stress, he seemed to have been doing

quite well except for the very recent hospitalization that was related to not having taking

medication.[9]  Tr. 309.  Dr. Haskins acknowledged that Fitch has real problems for which he is

being treated and opined that "[w]hen [Fitch is] fully treatment compliant claimant functions

fairly well."  Tr. 309.

In the Mental RFC, Dr. Haskins found Fitch not significantly limited in eleven of the

twenty rated areas and moderately limited in the nine other rated areas.  Tr. 306-307.  She did not

find any marked limitations.  Tr. 306-307.

In the Psychiatric Review Technique, Dr. Haskins assessed Fitch under Listing 12.04

(Affective Disorders), Listing 12.05 (Mental Retardation) and Listing 12.08 (Personality

Disorders).[10]  Tr. 310.   She did not find that Fitch's impairments met or equaled Listing 12.04,

but did find that Fitch suffered from depressive disorder, not otherwise specified.  Tr. 313.  She

---

[8] On January 14, 2009, Mel Zwissler, Ph. D. affirmed Dr. Haskin's assessment.  Tr. 351.

[9] See FN 6 *supra*.

[10]  Listing 12.04 and Listing 12.08 were specifically considered.  The Listing of Impairments (commonly
referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes
impairments for each of the major body systems that the Social Security Administration considers to be
severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,
education, or work experience.  20 C.F.R. § 404.1525.

did not find that Fitch's impairments met or equaled Listing 12.05, but did find that Fitch

suffered from borderline intellectual functioning.  Tr. 314.  She did not find that Fitch's

impairments met or equaled Listing 12.08, but did find that Fitch suffered from personality

order, not otherwise specified.  Tr. 317.  When rating his functional limitations, Dr. Haskins

found: (1) mild limitations in his activities of daily living; (2) moderate limitations in

maintaining social functioning; (3) moderate limitations in maintaining concentration,

persistence or pace; and (4) one or two episodes of decompensation, each of an extended

duration.  Tr. 320.

### C.  Testimonial Evidence

### 1.    Fitch's Testimony

Fitch was represented by counsel and testified at the administrative hearing.  Tr. 38-52.

He testified that his mental impairment impacts his ability to make it through a day without

requiring a nap or becoming angry.  Tr. 42-43.  He testified that his psychiatrist has prescribed a

number of different medications for his mental impairment.  Tr. 43-44.  Regarding his daily

activities, he testified that generally he stays at home during the day; he helps his parents a little

with household chores; does a little grocery shopping; goes to a donation center to get clothing

and other stuff; he exercises at home on a stationary bike; he watches television but does not

have a computer.  Tr. 44-46.  He testified that he has held numerous jobs over the years but

either quit or was terminated because he was depressed and could not handle the work; he kept

getting frustrated because he could not do the work the way it was supposed to be done.   Tr. 42,

49.  He testified that he visits with his case manager provided through the Columbiana County

Counseling Center about once each month.  Tr. 48-49.  She works with him and communicates

with him as to how he is handling himself on a regular basis.  Tr. 48-49.  He testified that he has

9

attempted suicide on at least two occasions.  Tr. 51-52.  He testified regarding his brief marriage in 2007 which ended due to incompatibility.  Tr. 50.  He indicated he resides with his parents and gets along pretty well with them, although he sometimes fights with them.  Tr. 51.

### 2.      Vocational Expert's Testimony

Vocational Expert James Ganoe (the "VE") testified at the hearing.  Tr. 53-56.  The VE testified as to exertional and skill level of Fitch's past work.  Tr. 53-54.  He indicated that Fitch's past work as a press operator was unskilled, light exertional level, and his past work as a construction laborer was unskilled, heavy exertional level.  Tr. 54.

The ALJ asked the VE to assume a hypothetical younger individual with the same limited education and work history as Fitch, with no exertional restrictions, but with non-exertional restrictions of not being able to work around hazards, such as dangerous machinery or unprotected heights; being capable of performing regular work with customary breaks every two hours, which would include a longer break for lunch; unable to perform detailed or complex tasks; being limited to simple one to three-step instructions; limited to occasional social interaction with the public that of a simple and superficial nature consistent with unskilled work; being capable of making simple work-related decisions, responding to changes in an unskilled work setting; being incapable of performing past production rate pace work with strict production standards.  Tr. 54.

The ALJ then asked the VE whether such a hypothetical individual would be capable of performing Fitch's past work and, the VE testified that such an individual would not be capable of performing Fitch's past work.  Tr. 54-55.

The ALJ then asked the VE whether there would be unskilled jobs that such a hypothetical individual could perform.  Tr. 55.  The VE testified yes, there would be unskilled

jobs available and provided examples of unskilled jobs at each exertional level that such an individual could perform: (1) cleaner – heavy exertional level; (2) kitchen helper – medium exertional level; (3) laundry worker – light exertional level; and (4) general sorter and setter – sedentary exertional level.  Tr. 55.

The VE testified that if any interaction with the public were removed from the individual's job duties, the individual would not be precluded from performing the stated jobs. Tr. 55.  When asked what the tolerance would be for an individual to be off task due to mental or emotional distress such that more than the customary breaks would be required, the VE testified that most employers will allow an employee to be off task approximately 10% of the time, and also testified that most employers would allow an employee to be absent one, at most, two days per month in an unskilled position.  Tr. 55-56.  Fitch's counsel did not have any questions for the VE.  Tr. 56.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

11

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

**IV. The ALJ's Decision**

In his May 17, 2010, decision, the ALJ made the following findings:

1.      Under *Drummond* and Acquiescence Ruling 98-4(6), *res judicata* precludes consideration of the application for the period of January 2, 2001, through December 11, 2003.[11]

2.      Fitch met the insured status requirements through June 30, 2007.

3.      Fitch had not engaged in substantial gainful activity since December 12, 2003.

4.      Fitch had severe impairments of: depressive disorder, not otherwise specified; borderline to low average intellectual functioning; and personality disorder, not otherwise specified.

5.      Fitch did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.

6.      Fitch had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: he should avoid exposure to hazards such as dangerous machinery or unprotected heights; he is capable of simple, unskilled tasks with one to three step instructions; and he should not have to interact with the general public.

7.      Fitch was unable to perform any past relevant work.

8.      Fitch was born on December 3, 1967, and was a "younger individual" within the meaning of the regulations.

9.      Fitch had "limited" education within the meaning of the regulations and was able to communication in English.

10.    Transferability of job skills was not an issue because Fitch's past relevant work was unskilled work.

11.    Considering Fitch's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Fitch could perform; specifically, cleaner, kitchen helper, laundry folder/worker and general sorter and setter.

12.    Fitch had not been under a disability at any time since December 12, 2003.

Tr. 12-29.

---

[11] *See* FN 1 *supra*.

## V. Parties' Arguments

### A.    Plaintiff's Arguments

In support of its arguments Fitch relies on a June 23, 2010, letter from his treating psychiatrist Dr. Kothari that was submitted to the Appeals Council but not to the ALJ.  Doc. 16, p. 7, 454.  More particularly, Plaintiff argues that the ALJ did not articulate valid reasons for rejecting the opinions of Dr. Kothari.  Doc. 16, pp. 10-11.  Fitch also argues that the ALJ did not articulate valid reasons for discrediting Fitch's testimony.  Doc. 16, pp. 12-14.  Finally, Fitch argues that the ALJ erred at Step Five by relying on VE testimony given in response to a hypothetical that did not incorporate all of his limitations.  Doc. 16, pp. 14-15.

### B.    Defendant's Arguments

In response, the Commissioner first argues that this Court should not consider the additional medical evidence that Plaintiff submitted to the Appeals Council, i.e., a June 23, 2010, letter from Dr. Kothari, because said evidence was not submitted to or considered by the ALJ.  Doc. 19, pp. 8-9.  The Commissioner also argues that substantial evidence supports the ALJ's RFC findings, his evaluation of the medical source opinions and his evaluation of Fitch's credibility.  Doc. 19, pp. 10-13.  Finally, the Commissioner argues that substantial evidence supports the ALJ's Step Five findings.  Doc. 19, pp. 14-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.     This Court may not rely upon or consider Dr. Kothari's June 23, 2010, letter because it was not submitted to the ALJ.**

Plaintiff relies in part on Dr. Kothari's June 23, 2010, letter to support his appeal. Doc. 16, p. 7, Tr. 454. This is improper. The Sixth Circuit has held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ. *See Jones v. Commissioner*, 336 F.3d 469, 478 (6th Cir. 2003); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also Osburn v. Apfel*, No. 98–1784, 1999 WL 503528, at * 4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported her decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ."). The court may not consider a plaintiff's proposed addition to the record in determining whether the Commissioner's decision is supported by substantial evidence. *See Cline,* 96 F.3d at 148. Evidence first submitted to the Appeals Council may be considered only to determine whether the case should be remanded under sentence six of 42 U.S.C. § 405(g). *Id.* The statute permits only two types of remand: a sentence four (post-judgment) remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and a sentence six (pre-judgment) remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision. *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006). The court cannot consider evidence that was

not submitted to the ALJ in the sentence four context; it only can consider such evidence in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.  Fitch has not has not requested a sentence six remand.  Accordingly, based on the foregoing the Court has not and will not consider the June 23, 2010, letter from Dr. Kothari which was not in the record when the ALJ issued his decision.

**B.  The ALJ properly articulated valid reasons for the weight provided to treating psychiatrist Dr. Kothari's opinions.[12]**

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  The Commissioner's regulations impose a clear duty always to give good reasons for the weight given to treating source opinions.  Cole v. Comm'r of Soc. Sec., 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(d)(2)).  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Cole, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

The ALJ sufficiently explained how he considered and weighed the Functional Assessment signed by Dr. Kothari on March 30, 2010, which included both handwritten notes and a checklist of limitations.  Tr. 22-23, 25-28.  The ALJ gave weight to the limitation ratings checked on the Functional Assessment to the extent consistent with Dr. Kothari's records, and clearly explained how even the limitations noted by Dr. Kothari as being severe were accounted

---

[12] To the extent that Fitch relies on Dr. Kothari's June 23, 2010, letter to support his "treating physician" argument (Doc. 16, pp. 10-11), said reliance is improper as discussed *supra*.

for in the RFC, i.e., the ALJ indicated that the RFC accommodated ". . . even the severe reference to maintaining attention and concentration and behaving predictably in social situations by reducing him to simple, unskilled work with no public contact." Tr. 25-28.  In addition to addressing how the severe limitations noted by Dr. Kothari were accommodated in the RFC, the ALJ also discussed the limitations in his Step Three analysis.  Tr. 23.  When reaching his conclusion that Fitch had moderate, not marked, difficulties in concentration, persistence or pace, the ALJ acknowledged Dr. Kothari's opinion that Fitch had severe limitations in his ability to maintain attention and concentration, but also factored in Dr. Kothari's opinion that Fitch had only slight problems with pace, judgment, memory, ability to care for himself and follow simple instructions.[13]  Tr. 23.

The ALJ acknowledged the handwritten notes on the Functional Assessment but accorded less weight to them.  Tr. 25.  Based on a comparison of other handwritten treatment notes, the ALJ determined that the handwritten notes in the Functional Assessment were written by the case manager, not by Dr. Kothari.  Tr. 25.  Further, the ALJ did not find those handwritten statements to be persuasive.  Tr. 25.  The ALJ determined that the handwritten notes were not supported by the observations of Dr. Kothari who regularly indicated that Fitch's mood, affect and behavior were generally normal when Fitch followed his treatment regime.  Tr. 25.  Fitch seems to argue that his hospitalizations over the years are proof that he is not stable.  Doc. 16, p. 11.  However, as noted earlier, Fitch's failure to take his medications was part of what led to the emergency treatment and/or hospitalizations.  Tr.  270, 308.   Evidence of emergency treatment and/or hospitalizations therefore is not proof that Fitch was unstable all the time and does not

---

[13] Additionally, the ALJ also considered the consultative examiner's opinion that Fitch was only mildly limited as to concentration, persistence and pace.  Tr. 23.

show that Dr. Kothari's findings that Fitch's mood, affect and behavior were generally normal were inaccurate or improperly relied upon by the ALJ.

The ALJ also determined that the handwritten notes on the Functional Assessment were contrary to the checklist portion of the report. Tr. 27. For example, Dr. Kothari rated the "[e]stimated impairment of [Fitch's] ability to tolerate low stress work on sustained basis" to be moderate. Tr. 451. This rating is not entirely consistent with the handwritten note that states it is "unlikely that Jim will be able to sustain employment . . ." Tr. 451. The ALJ also questioned the reliability of the case manager's view that Fitch would be unable to sustain employment because of her continued advocacy in favor of Fitch pursuing disability benefits notwithstanding a record that reflects that Fitch had functional abilities but lacked motivation to pursue almost all of the case manager's recommendations. Tr. 25-26. As noted by the ALJ, Fitch is not even motivated enough to leave his home to visit his case manager. Tr. 27. Even if the handwritten statements are accepted as those of Dr. Kothari because he signed the Functional Assessment, the ALJ's findings that those statements are inconsistent with both the checklist sections contained therein and Dr. Kothari's own treatment records remain valid based on the record.

While the ALJ discounted Fitch's treating psychiatrist's opinion, the ALJ's reasons are supported by the record and are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Cole, 661 F.3d at 937. Accordingly, Fitch's argument that the ALJ failed to articulate valid reasons for discrediting Fitch's treating psychiatrist is without merit.

**C.    The ALJ properly assessed Fitch's credibility.**

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms.

First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, 1996 SSR LEXIS 4, at *5–8 (1996).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  Calvin v. Comm'r of Soc. Sec., 437 F. App'x 370, 371 (6th Cir. 2011) (citing Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997)).  Here, the ALJ did consider the entire case record and conducted a thorough credibility analysis.  Tr. 24-25.

The ALJ recognized that Fitch satisfied the first step, i.e., that he had a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged, but also determined that Fitch's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the RFC.  Tr. 24-25.

In reaching his conclusion that Fitch's statements were not entirely credible, the ALJ considered the fact that Fitch's psychological problems were exacerbated by non-compliance

with treatment or medication.  Tr. 24.   In 2005, Fitch had stopped medication for about six months, was experiencing heightened problems with depression, and was referred by his mother to the Columbiana County Counseling Center due to self reports of suicidal ideation.  Tr. 290, 293.  On October 28, 2007, Fitch was at the emergency room requesting a refill of his medication.  Tr. 270.  He reported that he had run out of the medication that he was supposed to take for depression and, since having not taken some of his medication, he was "more agitated and generally short tempered."  Tr. 270.  In 2008, he had stopped medication and was hospitalized for depression, auditory hallucinations and suicidal ideation; he was not taking his medication.  Tr. 247, 308.   Also, in 2009, there were missed appointments resulting in Fitch not refilling prescriptions.  Tr. 24-25, 421, 443.  The foregoing evidence supports the ALJ's assessment.

Further, the ALJ noted that Fitch has declined his case manager's suggestions about other types of help to improve his problems, i.e., volunteering, peer mentoring program, communicating with his brother to set up a monthly get-together, therapy, yet Fitch does engage in some activities when he feels like it.  Tr. 24, 403, 405, 415, 417.

Additionally, the ALJ relied on Fitch's treating psychiatrist's consecutive treatment notes reflecting Dr. Kothari's opinion that Fitch was "doing fine in terms of mood, affect and behavior" with no new symptoms or complaints.  Tr. 24, 356, 347, 350, 437, 438-440, 442, 444-447.  The ALJ noted that, except for the informal meetings with his case manager at his residence, Fitch did not receive formal or regular therapy.  Tr. 24.  The ALJ indicated that the record showed that Fitch enjoyed communicating online with women even though he claimed not to have a computer; he was able to go out in public for walks to the pool and at a high school

20

track, to bars to meet women, to the Way Station to pick up items for himself; and he was able to assist his parents at home.  Tr. 25, 44-46, 403, 425, 427.

The ALJ, who had the ability to observe Fitch's demeanor and credibility and who reviewed the record, found that Fitch has done little more than take medication to try to help his condition, even though he is capable of taking additional steps to help himself.  Given the great weight and deference accorded an ALJ's credibility determination and the thoroughness with which the ALJ here discussed and supported his credibility determination, Fitch's argument that the ALJ erred in that determination is without merit.

**D.     The ALJ's Step Five determination is supported by substantial evidence.**

Fitch argues that the ALJ improperly relied on the VE's testimony because the ALJ did not ask the VE a proper hypothetical.  Doc. 16, pp. 14-15. The basis for Fitch's argument is his contention that the hypotheticals posed did not incorporate all of his limitations.  Doc. 16, pp. 14-15.  To support this contention, Fitch relies in part on Dr. Kothari's June 23, 2010 letter.  As discussed above, that letter may not be considered by this Court because it was never submitted to the ALJ.  Furthermore, Fitch's argument lacks merit because "[h]ypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  The ALJ relied on VE testimony in response to hypotheticals that incorporated the limitations that the ALJ determined were credible and supported by the record.  Therefore, Fitch's argument that it was improper for the ALJ to rely on the VE's testimony in support of his conclusions is without merit.

## V.  Conclusion and Recommendation

For the foregoing reasons, it is recommended that the Commissioner's decision be

**AFFIRMED**.

Dated:  July 13, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).